1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

RAUL ARELLANO,
CDCR #AH-1995,

Plaintiff,

vs.

DR. GULDSETH;
DR. S. ROBERTS,

Defendants.

Case No.:  3:20-cv-1633-RBM-DDL

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT PURSUANT
TO Fed. R. Civ. P. 56**

**[Doc. 49]**

Plaintiff Raul Arellano ("Plaintiff" or "Arellano"), currently incarcerated at
Richard J. Donovan Correctional Facility ("RJD") in San Diego, California, and
proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983 on October
18, 2018. *See* Compl., Doc. 1.[1] Arellano claims Dr. Guldseth, a doctor at RJD, violated
his First and Eighth Amendment rights, and violated the Bane Act, by refusing to
prescribe increased doses of Gabapentin—a medication he contends was previously

---

[1] Throughout this Order and for ease of consistency and reference, the Court will cite to
each document in the record using both the number assigned to the document and the page
number automatically generated by its Case Management/Electronic Case File system
("ECF").

1

prescribed to treat both his neuropathic pain and seizures—and also ordering excessive and retaliatory drug testing in retaliation for seeking adequate medical care. *See id*. at 5. In addition, Arellano claims Dr. S. Roberts, RJD Chief Medical Executive, violated his Eighth Amendment rights when he responded to Arellano's grievances regarding the alleged failure to provide adequate medical care and failed to intervene in the decision to discontinue Gabapentin. *See id.* at 11.

## I.   PROCEDURAL HISTORY

Defendants Drs. Guldseth and Roberts have filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. *See* Doc. 49. The Court has provided Arellano with notice of the requirements for opposing summary judgment as required by *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland,* 154 F.3d 952 (9th Cir. 1998) (en banc). *See* Doc. 51. After Arellano was granted two extensions of time to file an Opposition, *see* Docs. 53, 58, he sought a third extension of time to file his Opposition and attached his proposed Opposition, *see* Doc. 64.  The Court denied this third request and adopted the proposed Opposition, *see* Doc. 64-4, as Arellano's Opposition.  *See* Doc. 65.

Defendants filed their Reply on March 1, 2023.  *See* Doc. 69.  Arellano later filed a "Motion for Leave to File Sur-Reply" which the Court granted.  *See* Docs. 72, 73. However, the deadline for filing the sur-reply has passed and Arellano failed to file a sur-reply.

Having now carefully considered the full record as submitted, the Court finds Defendants Guldseth and Roberts are entitled to judgment as a matter of law with respect to all of Arellano's claims, **GRANTS** Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Doc. 49) and **DIRECTS** the Clerk to enter judgment accordingly.

/ / /

/ / /

/ / /

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A. <u>Standard of Review</u>

A court may grant summary judgment when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. *See Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102–1103 (9th Cir. 2000).

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." *Id*. But if the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute as to any material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a

3

genuine issue for trial." *See Estate of Tucker*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks and citation omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party. *See Stegall v. Citadel Broad, Inc.*, 350 F.3d 1061, 1065 (9th Cir. 2003). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp.*, No. 11–09068, 2013 WL 1010547, *4 (C.D. Cal. Mar. 13, 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). A "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249–50 (citation omitted); *see also Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment. *See Nissan Fire & Marine*, 210 F.3d at 1103.

B.    Arellano's Medical History & Treatment Record[2]

Arellano claims to suffer from seizures, diabetes, and ongoing chronic pain due to neuropathy and nerve damage caused by an excessive force incident in 2010, a fall from

---

[2]   Arellano filed twelve other civil rights actions in the Southern District of California between March 13, 2014, and the filing of this case on August 20, 2020. *See* https://pcl.uscourts.gov/pcl/pages/search/results/parties.jsf?sid=7c27a3f46e614a728d908 c0a0c018752 (last visited May 2, 2023)*.*   At least five of these matters contain Eighth Amendment inadequate medical care allegations related to pain medication. However, all of Arellano's previously filed claims name different RJD doctors, nurses, and inmate appeals officials as Defendants. While similarly based on his Eighth Amendment right to adequate medical care, none are duplicative of the claims Arellano alleges against Dr. Guldseth or Dr. Roberts in this matter, which Arellano contends first arose at RJD in December of 2018. *See* Doc. 1 at 1, 3-4; *cf. Arellano v. Hodge, et al.,* S.D. Cal. Civil Case No. 3:14-cv-00590-JLS-JLB; *Arellano v. Sedighi, et al.*, S.D. Cal. Civil Case No. 3:15-cv-

his bunk in 2012, and a suicide attempt in April 2018. *See* Compl., Doc. 1 at 3.
Defendants do not dispute Arellano suffers from "diabetic neuropathy and has
complained of seizures since 2010, but the type of seizure has not been diagnosed."
Defs.' Memo of Ps & As in Supp. of Mtn. for Summ. J. (hereinafter "Defs. Ps & As"),
Doc. 49 at 11.

In December of 2015, Arellano's primary care physician Dr. Luu prescribed him
Lyrica[3] but due to the side effects Arellano experienced, he later switched him to
Gabapentin[4].  Initially, Arellano began receiving 900 mg of Gabapentin per day, along

---

02059-AJB-BGS; *Arellano v. Melton, et al.*, 3:15-cv-02069-JAH-NLS; *Arellano v. Dean, et al.*, 3:15-cv-02247-BEN-JLB; and *Arellano v. Santos*, 3:18-cv-02391-BTM-WVG. However, in some of these cases while the timeframe is different and therefore the matters are not duplicative, the underlying facts are nearly identical in some of these cases and the Court will take judicial notice of these actions where they are deemed relevant.

[3] According to the Physician's Desk Reference ("PDR") Lyrica® is the brand name for Pregabalin and is also the CCHCS's recommended formulary medication for the treatment of diabetic neuropathy and partial seizures. *See* Decl. of Guldseth in Supp. of Mtn. Summ. J. (hereinafter "Guldseth Decl.") Doc. at 49-3 at ¶ 3; Defs. Ex. 7, Doc. 49-6 at 1983. The Court may take judicial notice of medical facts regarding prescription drugs, their active ingredients and effects as described in the PDR. *See United States v. Howard,* 381 F.3d 873, 880 & n.7 (9th Cir. 2004) (taking judicial notice of the narcotic effects of Percocet and Percodan noted in PDR); *see also Lolli v. County of Orange*, 351 F.3d 410, 419 (9th Cir. 2003) ("Well-known medical facts are the types of matters of which judicial notice may be taken.") (quoting *Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1395 n.2 (9th Cir. 1995)).

[4] Gabapentin (Neurontin®) is prescribed for "restless legs syndrome, postherpetic and other neuralgias, and adjunctively for partial seizures." Prescriptions must also be "[m]onitor[ed] for emerging or worsening suicidal thoughts or actions and/or depression." https://www.pdr.net/drug-summary/Neurontin-gabapentin-2477.4218 (last visited Mar. 23, 2023); *see also* "CCHCS Care Guide: Pain Management Part 2- Therapy-Non-Opioid," Doc. 49-6 at 1983 (classifying Gabapentin as non-formulary and appropriate for consideration only in "cases with objective evidence of severe neuropathic pain after documented trials of 1st and 2nd line agents (TCA [Tricyclics], SNRI [serotonin norepinephrine reuptake inhibitors])," and noting "only FDA indications for Gabapentin [as]: partial onset seizures (adjunct) [and] post herpetic neuralgia (PHN)," adverse effects

5

with Depakote[5].  *See* Doc. 49-6 at 2010-2011, Pl.'s Dep. at 43:10-13.  Arellano testified the Gabapentin was prescribed to "get more control of [his] seizures and [his] pain, nerve damage pain." *Id.* at 43:13-15.  By September of 2017, Arellano's RJD primary care physicians increased his Gabapentin dose to 900 milligrams three times a day.  *See id.* at 2012, Pl.'s Dep. at 44:11-13.  When his Gabapentin dosage was increased to 2700 milligrams a day in 2017, Arellano believed that his "partial seizures were basically almost gone" and his pain was "less severe." *Id.* at 2014, Pl.'s Dep. at 46:22-25 to 47:1-2.

However, two months later, in November of 2017, Arellano was seen by Dr. Messler and Arellano informed her that he was in a "severe level of pain." *Id.* at 2012, Pl.'s Dep. at 44:15-20.  Dr. Messler ordered an "EMG[6] and x-rays" which "came back normal." *Id.* at 44:19-22.  Arellano testified that when he was taking 2700 milligrams of Gabapentin his "partial seizures were basically almost gone." *Id.* at 2014, 46:21-23.

However, in January of 2018, Arellano reported that his "chronic pain had increased" and the "effectiveness of the pain medication had decreased." *Id.* at 2016; 48:8-9; 48:14-16.  In February of 2018, Arellano reported that he was experiencing "pain and seizures" and his pain was at "level 10." *Id.* at 2017; 49:17-20.  In addition, Arellano

---

including "dizziness, cognitive impairment, fatigue, nausea and vomiting headache," and advising "caution in patients with … suicidal behavior and ideation.").

[5] Depakote® is the brand named for divalproex sodium. It is an "anti-epileptic drug" indicated for "[m]onotherapy and adjunctive therapy of complex partial seizures and simple and complex absence seizures." "Patients treated with [Depakote] for any indication should be monitored for the emergence or worsening of depression, suicidal thoughts or behavior, and/or unusual changes in mood or behavior." *See* https://www.pdr.net/full-prescribing-information/Depakote-Tablets-divalproex-sodium-1075 (last visited Mar. 23, 2023).

[6] EMG is an acronym for electromyography which is a test that "measures the electrical activity of muscles and nerves." *See* https://medlineplus.gov/lab-tests/electromyography-emg-and-nerve-conduction-studies/ (last visited Apr. 13, 2023).

was "losing balance and having bladder problems," and as a result, he sought an increase in the dosage of Gabapentin he was receiving.  *Id.*

In March of 2018, Dr. Santos became Arellano's primary care physician.  *Id.* at 2020; 52:18-25.  During this same time frame, Arellano was placed in a mental health crisis bed for approximately thirty days for attempting suicide.  *Id.* at 2023; 50:7-10. However, Arellano attests that he was "discharged too soon" because he was still in "intense pain."  *Id.* at 2024; 56:14-17.  Arellano saw Dr. Santos for the first time on May 7, 2018.  *See id.* at 56:24-25.

On June 14, 2018, Dr. Santos reduced Arellano's Gabapentin prescription from 2700 milligrams per day to 2400 milligrams per day.  *See id*. at 2028; 61:1-7.  Arellano found this to be "unreasonable" and he "got mad."  *Id.*  In October of 2018, Arellano filed a civil rights action against Dr. Santos, in part alleging that Dr. Santos violated his Eighth Amendment rights when he tapered Arellano's dosage of Gabapentin.[7]  *See generally Arellano v. Santos,* S.D. Cal. Civil Case No. 3:18-cv-02391-BTM-WVG, Doc. 1, Compl. In this matter, District Judge Barry Ted Moskowitz found that the "medical records before the Court, offered both by Dr. Santos in support [of Dr. Santos' Motion for Summary Judgment] and by Arellano in opposition, establish that the medications and overall course of treatment Dr. Santos provided to Arellano from March 2018 through October 2018 was medically appropriate under the circumstances."  *Id*., Doc. 91, Order Granting Defendant's Motion for Summary Judgment at 25.

       1.  Arellano's Medical History – Dr. Guldseth

`     On December 12, 2018, Dr. Guldseth became Arellano's primary care physician. *See* Guldseth Decl., Doc. 49-3 at ¶ 2.  Arellano was "prescribed 1800 mg of Gabapentin,

---

[7] A court "'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'" *Bias v. Moynihan,* 508 F.3d 1212, 1225 (9th Cir. 2007) (quoting *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002)).

1950 mg of acetaminophen, and 1000 mg naproxen daily to address his complaints of neuropathic pain." *Id.* at ¶ 3.  Arellano continued to complain of "intense pain" that was preventing him from eating and sleeping.  *See* Doc. 49-6 at 2110-11; 48:12 – 49:1.

Dr. Guldseth examined Arellano for the first time on January 3, 2019.  *See* Guldseth Decl., Doc. 49-3 at ¶ 4.  Dr. Guldseth attests that he raised with Arellano his purported refusal to submit to having lab work done on December 28, 2018 "intended to measure the Gabapentin levels" in his bloodstream for an upcoming "elective hernia repair surgery."  *Id.* However, Arellano informed Dr. Guldseth that he had "completed his labs" that morning. *Id.*

One week later, Dr. Guldseth saw Arellano on January 10, 2019.  *Id.* at ¶ 5.  He determined that Arellano was still taking his prescribed medication, but Dr. Guldseth advised Arellano to temporarily stop taking naproxen in preparation for his upcoming hernia surgery.  *Id.*  He explained to Arellano that it is a common practice in the medical community to temporarily stop all "non-steroid anti-inflammatory medications" before surgery to prevent excessive bleeding.  *Id.*  In response, Arellano sought to increase his Gabapentin "due to nighttime pain" but Dr. Guldseth refused.  *Id.*  In Dr. Guldseth's opinion, Arellano's practice of taking "several doses of Gabapentin before a blood draw" would indicate "abuse of medication" and a review of his medical history indicates that even when Arellano had been prescribed 2700 milligrams of Gabapentin daily, he still had "severe complaints of pain" which indicates that the medication was ineffective.  *Id.*

One day, Arellano "went to the line" but they would not give him the Gabapentin. *Id.* at 2104-05; 14:25 -15:1-2.  Arellano went to speak to Dr. Guldseth who told him that he discontinued his prescription because he missed his weekly blood draw.  *See id.* at 2105; 15:3-6.  Dr. Guldseth attests that he examined Arellano on January 30, 2019 in response to Arellano's healthcare requests where he indicated that he was suffering from "severe pain triggering seizures" and he had fallen down some stairs.  Guldseth Decl., Doc. 49-3 at ¶ 6.  Dr. Guldseth learned that Arellano had declined the hernia surgery.  *See id.*  They discussed his medication and Arellano "reported the Naproxen and Depakote

8

was helpful but he wanted 2700 mg of Gabapentin." *Id.* Dr. Guldseth told Arellano to report to the "Triage and Treatment Area (TTA)" because Arellano's seizures were "unwitnessed" and a "prolactin test done shortly thereafter could confirm that a seizure occurred." *Id.* Dr. Guldseth was willing to "titrate his Gabapentin dosage up to 2700 mg because recent records demonstrated compliance" but he told Arellano that he would discontinue this medication if he "was not compliant with his medications or refused to submit for lab work." *Id.*

On February 1, 2019, it was documented that Arellano refused to submit to a "Gabapentin level" blood draw. *See* ECF 49-6 at 1189, Progress Notes dated Feb. 1, 2019. As a result, Arellano's Gabapentin dosage was reverted to 1800 milligrams pursuant to the "previous agreement" with Dr. Guldseth that if he was not "compliant with levels labs and agreed upon plan, Gabapentin dose would be decreased." *Id.*

Arellano was seen by neurologist Chandler P. Malhotra ("hereinafter Dr. Malhotra") on February 1, 2019. *See* Doc. 49-6 at 571, Progress Record dated Feb. 1, 2019. Dr. Malhotra recommended that Arellano have an EMG for both of his legs for "assessment of neuropathy." *Id.* at 573. Following those tests, Arellano was to return to Dr. Malholtra for a "face [to] face" evaluation. *Id.* Dr. Malholtra did not make any recommendations regarding medication. *See* Guldseth Decl., Doc. 49-3 at ¶ 8.

Arellano then submitted "requests for healthcare services on February 3 and 5 stating he wanted 2700 mg of Gabapentin, custody staff caused him to be non-compliant and the Depakote should be discontinued because of stomach pain, dark urine, confusion, tiredness, nausea, vomiting, increase in depression, panic attacks, anxiety, trouble sleeping, drowsiness, blurred vision, balance issues, headaches, weakness, mouth sores, hives, difficulty breathing, irritability, and restlessness." *Id.* at ¶ 9; Doc. 49-6 at 528-529, Health Care Services Request form dated Feb. 3, 2019; Doc. 49-6 at 546, Health Care Services Request form dated Feb. 5, 2019.

Dr. Guldseth met with Arellano on February 12, 2019, to initiate Dr. Malholtra's recommendations to have an EMG conducted and schedule another "face to face" with

Dr. Malholtra.  Guldseth Decl., at ¶ 10.  Dr. Guldseth attests that before the appointment started a nurse purportedly heard Arellano say, "what he really needed was morphine since those go for $17 a piece on the yard" and this nurse reported to Dr. Guldseth what she allegedly heard Arellano reveal.  *Id.*  Arellano denies he ever made this comment and maintains that the correspondence documenting this comment could be interpreted as the nurse being told by another inmate that Arellano allegedly made this statement and the nurse herself did not overhear this alleged statement.  *See* Pl.'s Opp'n at 5.  Arellano specifically points to the emails dated February 12, 2019, between Jaymi Ramos, LVN ("Ramos") and Dr. Guldseth in which Ramos writes "FYI, patient was heard yesterday in front of the clinic saying he needed more gabapentin and that what he really needed was morphine since those go for 17 dollars a piece on the yard."  Doc. 46-6 at 604.  Dr. Guldseth responded "noted, thanks."  *Id.*  In the progress notes for this February 12, 2019, visit, Dr. Guldseth noted that Arellano was "[d]rug seeking for Gabapentin" and "recently was non-compliant with labs and/or meds."  Doc. 46-6 at 1153, Progress Notes dated Feb. 12, 2019.

On March 4, 2019, Arellano was scheduled for a blood draw to monitor his levels of Gabapentin, but he refused to comply with the blood draw.  *See* Guldseth Decl., at ¶ 12, Doc. 46-6 at 1189, Progress Notes dated Mar. 4, 2019.  Arellano does not deny he refused to submit to the blood draw, but he maintains that he was told the blood draw was for his hernia surgery and because he "didn't plan to go forward with surgery" he refused to have his blood drawn.  Pl.'s Opp'n at 5.

Dr. Guldseth attests that he was concerned that Arellano was "either abusing or diverting Gabapentin" and ordered "weekly lab tests to monitor [Arellano's] compliance."  Guldseth Decl., at ¶ 13.  He further told Arellano that if he continued to fail to comply with the blood draws, Dr. Guldseth would "taper the Gabapentin prescription."  *Id.*

Dr. Guldseth next examined Arellano on March 26, 2019, in response to Arellano filing a grievance requesting that the "Depakote to be discontinued and Gabapentin to be

increased." *Id.* at ¶ 15.  Dr. Guldseth informed Arellano that he would wait for the results from his EMG and a follow up with Dr. Malholtra "before changing medications." *Id.* Dr. Guldseth agreed to taper Arellano's Depakote prescription, but his Gabapentin prescription remained the same.  *See id.*

However, the following day on March 27, 2019, Arellano filed another grievance claiming he had seizures on March 1, 5, 16, and 27 and again sought an increase in his Gabapentin to 2700 milligrams.  *See* Doc. 49-6 at 525, Healthcare Services Request Form dated Mar. 27, 2019.

Arellano had an EMG on his "upper extremities" on April 23, 2019, but refused to allow the test to be performed on his "lower extremities" and thus, the study was "incomplete" but did not "demonstrate any evidence of carpal tunnel syndrome or sensory neuropathy." *Id.* at 570, Electromyography and Nerve Conduction Study report prepared by Dr. Malhotra.

Arellano was seen by Dr. Guldseth on May 2, 2019, and Dr. Guldseth noted that Arellano reported having a "seizure most recently 2 nights ago" which was purportedly witnessed by his cellmate but he did not seek medical treatment.   Guldseth Decl. at ¶ 19. Doc. 49-6 at 1184-85, Progress Notes dated May 2, 2019.  Dr. Guldseth "performed a review of symptoms" and indicated that "[n]eurology follow up is scheduled and would like recommendations if seizure medications are indicated at this point or if Gabapentin is indicated based on normal EMG results (though incomplete)." *Id.* ¶ 19, 1186.

Arellano then submitted several requests for healthcare services "complaining of pain, requesting an increase in Gabapentin, and orthopedic shoes." *Id.* at ¶ 20, Doc. 49-6 at 522, 537, 543, Healthcare Services Request Forms dated May 4, 11, and 29, 2019. Arellano had another "telemed" appointment with Dr. Malhotra who reviewed Arellano's medical history and "noted that he could not make a diagnosis because Mr. Arellano refused to complete the EMG."  Guldseth Decl. at ¶ 21; Doc. 49-6 at 589, Progress notes dated May 29, 2019.  Dr. Malhotra indicated that Arellano "needs to decide if he wants to complete the neurodiagnostic study."  Doc. 49-6 at 589.  Dr. Guldseth attests that a

review of Arellano's medical records indicates that Arellano "never requested to complete the EMG." Guldseth Decl. at ¶ 21.

On June 3, 2019, Arellano purportedly refused his "Gabapentin drug test." Doc. 49-6 at 1182, Progress Notes dated June 3, 2019. Based on his third missed blood draw, Dr. Guldseth decided to discontinue Arellano's Gabapentin and ordered that it be tapered off over a period of two weeks. *See* Guldseth Decl. at ¶ 22. Dr. Guldseth attests he made this medical decision based on a number of factors. *See id.* First, his decision was based on Arellano's history of drug abuse and Gabapentin's "potential to be a habit forming addictive medication." *Id.* Second, Gabapentin is a "drug prone to diversion" in the correctional setting and Arellano's failure to comply with lab testing, his comments regarding the cost of morphine on the yard, and a threat to sue a nurse if she did not increase his prescription "are all signs of diversion." *Id.* Third, Arellano had "ongoing complaints of alleged vision loss" which could be "complicated by Gabapentin" as the side effects of Gabapentin include "dizziness, ataxia, nystagmus, somnolence, and amnesia." *Id.* Finally, it was "not clear that Mr. Arellano benefited from Gabapentin" as his partial EMG "did not indicate neuropathy, for which Gabapentin is clinically indicated." *Id.*

Arellano disputes that he has a history of drug abuse. *See* Pl.'s Opp'n at 6. He claims that he only used marijuana "once every 3 months for [two] years" prior to the time he was incarcerated and only "used meth" when he was fifteen years old and he "didn't like it." *Id.* Arellano maintains that these facts do not "show abuse or addiction to drugs." *Id.* He indicates that his threat to sue a nurse was unrelated to the Gabapentin and his missed lab tests were the result of correctional officers "not opening [his cell] door." *Id.* at 7.

On June 7, 2019, Dr. Guldseth examined Arellano and "explained to Mr. Arellano that no witnessed seizures were documented" and he exhibited "manipulative drug seeking behavior. *Id.* at ¶ 23. Arellano was offered Cymbalta and Elavil "as a

replacement for Gabapentin, but he refused." *Id.* Depakote was reinstated for Arellano. *See id.*

Arellano was examined by Dr. Guldseth on July 10, 2019, and he reported to Guldseth that he was "compliant with his seizure medication, taking it every day, and had been seizure free for past several months, contrary to his prior statements." *Id.* at ¶ 24. As a result, Dr. Guldseth told Arellano that he would "reconsider Gabapentin upon completion of the EMG." *Id.*

On August 22, 2019, Arellano was seen by Dr. Guldseth and indicated that he "wanted Cymbalta discontinued because of stomach upset, and prescribed Gabapentin." *Id.* at ¶ 26. Arellano told Dr. Guldseth that he "sometimes has seizures but custody would not let him go to the TTA." *Id.* However, Dr. Guldseth attests that he again told Arellano that he "needed to follow-up with neurology for recommendations regarding medication." *Id.* Dr. Guldseth "discontinued Mr. Arellano's Depakote prescriptions because he was not taking it as prescribed." *Id.* Dr. Guldseth told Arellano again on September 9, 2019, that he "needed to follow-up with neurology for recommendations regarding medication." *Id.* at ¶ 27. Arellano was examined by Dr. Malhotra on September 20, 2019, who noted that Arellano "refused another [EMG]" and was "noncompliant" with his current medications." Doc. 49-6 at 565, Progress Record dated Sept. 20, 2019.

Arellano was sent to an outside hospital on October 5, 2019, after he purportedly fell and hit his head. *See* Guldseth Decl. at ¶ 29. He was given a "CT scan" which was "normal" and he was "returned to the prison in stable condition the same day." *Id.* Dr. Guldseth examined Arellano on October 10, 2019, and Arellano informed Dr. Guldseth that he "lost [his] balance and fell because of the neuropathy" and he "is going to keep falling until he gets his Gabapentin." Doc. 49-6 at 1171, Progress Notes dated Oct. 10, 2019. Arellano refused to have another EMG because he indicated that "[h]e had pain with EMG and he gets shocked too strong so he can't tolerate and go through with it." *Id.*

1    Dr. Guldseth's last appointment with Arellano was on October 15, 2019.  *See*

2    Guldseth Decl. at ¶ 30.  Dr. Guldseth noted in the progress notes that Arellano 'walked

3    easily into office, sat down without difficulty" and was "steady on his feet" with a

4    "strong, easy gait."  Doc. 49-6 at 1168, Progress Notes dated Oct. 15, 2019.  Arellano

5    asked for a referral to neurology and an increase of his Depakote and Guldseth "complied

6    with both requests."  Guldseth Decl. at ¶ 30.

7            2.    Arellano's Grievance History – Dr. Roberts

8    At some point in time, Arellano purportedly wrote to Roberts asking him to

9    intervene in Arellano's treatment by Dr. Guldseth.  *See* Compl. at 11.  After recounting

10   his course of treatment with Dr. Guldseth, Plaintiff asserts that Roberts "should have

11   recognize[d] that the deprivation of [Gabapentin] will trigger severe pain and

12   uncontrol[led] seizure[s]" leading to further health complications for Plaintiff.  *Id.*

13   Plaintiff claims Roberts then wrote back, "saying he w[ould not] intervene and for

14   [Plaintiff] to file [a] grievance."  *Id.*  Plaintiff alleges that he submitted a grievance on

15   December 23, 2019, which still has not been addressed by Roberts.  *See id.*

16       C.   Arguments

17   Dr. Guldseth first seeks summary judgment with respect to Arellano's Eighth

18   Amendment inadequate medical care claims because evidence in the record demonstrates

19   his decisions with respect to Arellano's Gabapentin prescription during the months of

20   January through October of 2019 were medically appropriate under the circumstances.

21   *See* Defs.' Mem. of P&A's at 22-24.  Specifically, Dr. Guldseth argues there is no

22   genuine dispute with respect to any deliberate indifference on his part because the risks of

23   continuing or increasing Arellano's Gabapentin prescription outweighed the benefits, the

24   decision to taper and then discontinue Arellano's Gabapentin prescription complied with

25   California Correctional Health Care Services ("CCHCS") policy, and he offered

26   Arellano's reasonable alternatives.  *Id.* at 22-26.  Dr. Roberts also moves for summary

27   judgment of the Eighth Amendment against him on the ground that he cannot be held

28   liable for failure to intervene with Dr. Guldseth's medical treatment as this treatment was

14

"medically appropriate, followed by appropriate alternatives, and in compliance with CCHCS policy." *Id.* at 30.

Dr. Guldseth also seeks summary judgment with respect to Arellano's First Amendment retaliation claims on grounds that the evidence in the record is insufficient to show his treatment decisions were adverse to Arellano's health or did not reasonably advance a legitimate correctional goal. *Id.* at 26-28.

Dr. Guldseth seeks summary judgment with respect to Arellano's Bane Act cause of action on the grounds that without a violation of Arellano's constitutional right or "some other statutory right, there can be no cause of action under the Bane Act." *Id.* at 29-30. Regardless, Dr. Guldseth also maintains that the Court should decline to exercise supplemental jurisdiction over this state law claim. *See id.* at 30.

Finally, both Defendants claim that because Arellano does not have a clearly established right to dictate any specific course of treatment, they are entitled to qualified immunity with respect to Arellano's Eighth Amendment claims for damages. *Id.* at 27–28.

In Opposition, Arellano argues that it is "not [his] fault" that doctors cannot "pinpoint the type of seizures" he experiences but he has told doctors that the only "successful combination" to treat his medical issues is Gabapentin with Depakote. Pl.'s Opp'n at 2. He claims that his continued requests for increases to the dosage of Gabapentin he was prescribed are "reasonable" because he was building a tolerance towards the medication. *Id.* at 3. Arellano also explains he refused to have his bloodwork taken because he mistakenly believed it was being taken only for his surgery that he declined to have and there is no evidence that he was going to sell these drugs or that he abused drugs. *See id.* at 4-8.

/ / /

/ / /

/ / /

/ / /

3:20-cv-01633-RBM-DDL

1
2
3

D.     Discussion

    1.     *Eighth Amendment Inadequate Medical Care Claims*

       *a.     Standard of Review*

The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and a failure to meet that obligation can violate the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). In order to prevail on an Eighth Amendment claim for inadequate medical care, however, a prisoner must show "deliberate indifference" to his "serious medical needs." *Id.* at 104. This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

To meet the Eighth Amendment's objective requirements, the prisoner must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104. A sufficiently serious need exists if failure to treat his injury or condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks omitted) (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

To meet the Eighth Amendment's subjective requirement of deliberate indifference, a "high legal standard," a prisoner must demonstrate the defendant "kn[e]w[] of and disregard[ed] an excessive risk to [his] health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057, 1060 (9th Cir. 2004) (internal quotation marks and citation omitted). This "requires more than ordinary lack of due care." *Farmer v. Brennan*, 511 U.S. 825, 835, (1994) (internal quotation marks omitted) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Deliberate indifference "may appear when prison officials

16

3:20-cv-01633-RBM-DDL

deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

"In deciding whether there has been deliberate indifference to a prisoner's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). However, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Rather, "to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), *overruled in part on other grounds by Peralta*, 744 F.3d at 1076)); *accord Gordon v. Cty. of Orange*, 6 F.4th 961, 970 (9th Cir. 2021).

### b.   Analysis

No party disputes Arellano's medical needs are objectively serious. *See Estelle*, 429 U.S. at 104; *Jett,* 439 F.3d at 1096; *McGuckin,* 974 F.2d at 1059. Nevertheless, based on the record before it, this Court finds no jury could reasonably conclude that either Dr. Guldseth or Dr. Roberts acted with deliberate indifference to Arellano's pain or his reported seizures.

### 1.  Claims against Dr. Guldseth

Specifically, Arellano claims that Gabapentin is the "only course of treatment effective for [his] serious medical conditions without severe side effects."  Compl. at 4. Prior to Dr. Guldseth becoming Arellano's PCP in December of 2018, another physician had prescribed Gabapentin and Depakote in 2016 to address Arellano's seizures, nerve damage, and diabetic neuropathy.  *See id*.  When Dr. Guldseth tapered Arellano off

Gabapentin, Arellano claims that he left Arellano "to suffer in acute pain which triggered [his] seizures" and put his "life at risk." *Id.* at 6-7.

However, the undisputed and overwhelming evidence in the record shows Arellano has an extensive medical history dating back to 2011 of chronic neuropathic pain for which he was continually treated by prison doctors, nurses, psychologists, and neurologists before Dr. Guldseth was assigned as his PCP from December 2018 through October 2019. Arellano's medical history, which has been documented in many of the cases Arellano has filed since 2015 and set forth above, shows that he was prescribed Depakote, Cymbalta, acetaminophen, naproxen, capsaicin cream, along with several other medications, and he has undergone several diagnostic tests such as X-rays, a CT scan, and a nerve conduction study.

It is undisputed that Arellano missed lab bloodwork and had incomplete EMG testing which Dr. Guldseth informed him he was required to complete in order to continue the Gabapentin. While Arellano maintains he was not abusing or diverting Gabapentin within RJD, he does not set forth any admissible evidence to dispute Dr. Guldseth's sworn declaration that he was given information indicating Arellano could potentially be engaging in these behaviors. Arellano does not provide any evidence to dispute the fact that Gabapentin is not an FDA drug approved for treatment of diabetic neuropathy or tonic-clonic seizures. Arellano does not dispute that he was referred to a neurologist multiple times and offered physical therapy, nursing appointments, and chronic pain appointments.

Arellano does not dispute or object to any of the voluminous medical records submitted by Defendants nor does he dispute any of the numerous Health Care Services Request Forms submitted by him to prison officials. Arellano's own testimony and medical records indicate that he filed at least fourteen separate HC 7362 Health Care Services Request Forms, and seven CDCR 602 HC Health Care Grievances between January and May of 2019. In response to each HC 7362, Arellano was personally examined by Dr. Guldseth on at least five occasions. Each time, Arellano complained of

neuropathic pain, and each time Dr. Guldseth continued his prescription medication, sometimes prescribed different medication, sometimes increased dosages while other times decreasing dosages, as well as suggesting non medication type intervention or suggesting alternative pain medication based on Arellano's medical care record, mental health, and documented history of noncompliance with both his Gabapentin and Depakote prescriptions.  Between January and October 15, 2019, the last time Dr. Guldseth saw Arellano as his PCP, he examined Arellano on eleven separate occasions.

And while the record also shows Arellano repeatedly insisted that only increased levels of Gabapentin were appropriate to treat both his pain and his seizures, Arellano is not a medical expert, and his unsupported lay opinion as to the efficacy or superiority of Gabapentin over any alternate medication is insufficient as a matter of law to establish a genuine factual dispute. *See Estelle*, 429 U.S. at 93 (stating that the question whether "additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"); *Toguchi*, 391 F.3d at 1058 (finding arguments  that "Seroquel is superior to Triafon and therefore should not have been discontinued" insufficient to establish deliberate indifference); *see also Valdez v. Zhang*, No. 20-cv-0736-JLS-WVG,  2023 WL 2657626, at *7 (S.D. Cal. Mar. 27, 2023) (Plaintiff failing to "offer any evidence whatsoever that [his doctor's] clinical assessments and recommendations deviated from prevailing standards of care" defeats any finding of deliberate indifference to an "excessive risk to plaintiff's health."); *O'Brien v. Saha*, No. 19-CV-1957-JLS-JLB, 2021 WL 960693, at *6 (S.D. Cal. Mar. 15, 2021) (concluding that "no reasonable juror could find that Defendants were deliberately indifferent to Plaintiff's pain in tapering him off morphine and gabapentin and pursuing a variety of other pain treatment options over a period of many months"); *Peacock v. Horowitz,* No. 13-cv-2506-TLN-AC, 2016 WL 3940346, at *7 (E.D. Cal. July 21, 2016) ("While plaintiff is certainly free to refuse specific medications or types of medications, he does not have a right to dictate what medications he will be prescribed.").

1    Here, the medical records before the Court establish that the medications and

2    overall course of treatment Dr. Guldseth provided to Arellano from January 2019 through

3    October 2019 was medically appropriate under the circumstances. *See Toguchi*, 391 F.3d

4    at 1058; *Jackson*, 90 F.3d at 332. Arellano disagrees, but his lay opinion alone,

5    unsupported by any "particular parts of materials in the record, including depositions,

6    documents, … affidavits or declarations, stipulations, … admissions, interrogatory

7    answers," or other admissible evidence which corroborates his conclusion or reasonably

8    tends to show Dr. Guldseth chose any particular course of treatment with conscious

9    disregard of his needs, is insufficient to establish a genuine dispute. Fed. R. Civ. P.

10   56(c)(1)(A); *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003)

11   ("Conclusory allegations unsupported by factual data cannot defeat summary

12   judgment."); *Schultz v. Leighton*, 325 F. Supp. 3d 1069, 1077–78 (N.D. Cal. 2017)

13   (finding prisoner failed to "show any unmet medical need, much less deliberate

14   indifference" and granting summary judgment where prisoner's "claim of a need for

15   morphine, or any treatment other than the treatment he received, [wa]s based entirely on

16   self-diagnosis and [without] medical support.").

17   For these reasons, the Court holds that Dr. Guldseth is entitled to summary

18   judgment with respect to Arellano's Eighth Amendment inadequate medical care claims.

19                          2.  Claims against Dr. Roberts

20   Arellano's claims against Dr. Roberts, as the Chief Medical Officer for RJD, are

21   based on his allegations that he provided information to Dr. Roberts about his course of

22   treatment with Dr. Guldseth and based on that information, Dr. Roberts "should have

23   recognize[d] that the deprivation of [Gabapentin] w[ould] trigger severe pain and

24   uncontrol[led] seizure[s]" leading to further health complications for Arellano.  Compl. at

25   11.  Arellano claimed that he wrote to Dr. Roberts asking him to intervene in Arellano's

26   treatment by Dr. Guldseth.  *See id*.  Dr. Roberts reportedly responded to Arellano "saying

27   he w[ould not] intervene and for [Arellano] to file [a] grievance."  *Id.*  Arellano claimed

28   to file a grievance on December 23, 2019 but it was never addressed by Dr. Roberts.  *See*

*id.*  In his declaration, Dr. Roberts attests that he has "no memory of Mr. Arellano writing me about his medical care in June 2019" but even if he did receive a request by Arellano to intervene, he "would not have intervened in Dr. Guldseth's plan of care."  Roberts Decl. at ¶ 12.

Dr. Roberts opines that in his "professional judgment, Mr. Arellano's claim that Dr. Guldseth was deliberately indifferent to his serious medical needs by discontinuing his prescription for Gabapentin for no reason, leaving him in chronic pain, is unsupported by the medical record or medical literature." *Id.* Dr. Roberts notes that Gabapentin is not "FDA approved for diabetic neuropathy, and the evidence supporting its usefulness for such treatment is minimal." *Id.* at ¶ 5.  Instead, he points to evidence in Arellano's medical records that show Dr. Guldseth did in fact prescribe a medication that is FDA approved to treat diabetic neuropathy.  *See id.* at ¶ 11.

Arellano offers no admissible evidence to contradict Dr. Robert's professional opinion that he received adequate medical care from Dr. Guldseth and even if he had received Arellano's grievance, he would not have made any changes to the medical treatment he received.  Again, Arellano's opinion as a lay person as to the type of medication he believes he should have received is insufficient to overcome the overwhelming amount of evidence in the record that he received adequate medical care. In addition, Arellano's Opposition does not attempt to address the claims against Dr. Roberts or provide any evidence of the specific grievance he claimed to have filed or when he filed it.  Therefore, the Court finds Arellano has failed to raise a triable issue as to whether Dr. Roberts was deliberately indifferent to his serious medical needs by not intervening in the medical care provided by Dr. Guldseth.

## 2.    First Amendment Retaliation Claims

Guldseth next seeks summary judgment with respect to Arellano's claims that he ordered "weekly blood draws in retaliation for his grievances." *See* Defs.' Ps & As at 26. Guldseth argues that all of his decisions related to Arellano's medical care were "rooted

in the legitimate correctional goals of preventing drug addiction and diversion and treating patients with medically appropriate medications." *Id.*

A prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives to the corrections system." *Silva v. Di Vittorio*, 658 F.3d 1090, 1104 (9th Cir. 2010), *overruled on other grounds, Richey v. Dahne*, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015). Included among those rights is the right to file prison grievances without retaliation. *Id.* To prevail on a retaliation claim, however, a prisoner must show: (1) a state actor took some adverse action against the prisoner (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the prisoner's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) (citation omitted).

In his Complaint, Arellano alleges Dr. Guldseth told Arellano that the reason he was not increasing his dosage was because Arellano filed too many grievance forms, and that it was more important "for his higher personnel to see he's not prescribing Gabapentin" than to address Arellano's pain. Compl. at 5. However, a careful review of the record before the Court shows that while Arellano claims Guldseth's decisions to require weekly blood draws were motivated by a desire to retaliate against him for filing multiple grievances, he nevertheless fails to corroborate these conclusory allegations by pointing to any evidence in the record that might reasonably support them. *See Villiarimo v. Aloha Island Air., Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (noting that no "genuine issue [as to a material fact] [exists] where the only evidence presented in 'uncorroborated and self-serving' testimony") (citation omitted).

As discussed with respect to Arellano's Eighth Amendment claims, the record before the Court, including Arellano's own deposition testimony, medical records, CDC 7362's and CDC 602 Health Care Grievances, as well as Dr. Guldseth's responses throughout the months of January to October of 2019, contains more than enough evidence to show Guldseth, as well as many other RJD medical officials including a

3:20-cv-01633-RBM-DDL

neurologist, timely and repeatedly responded to Arellano's multiple reports of chronic pain, reported but medically unsubstantiated seizures, the side-effects of every formulary and non-formulary medication prescribed (including Gabapentin), as well as the potential for its abuse given his prior history, non-compliance, and repeated demands for a specific drug and at increasingly high dosage levels. No evidence of retaliatory intent can be reasonably inferred from this factual and undisputed record. *See Brodheim*, 584 F.3d at 1269 (holding a plaintiff must set forth evidence showing that his treating physician's chosen course of treatment decisions were medically unacceptable, or that his filing prisoner appeals "was the 'substantial' or 'motivating' factor behind the Defendant's conduct.").

Guldseth argues that he "acted to advance the legitimate correctional goal of preventing the abuse and diversion of Gabapentin and providing medically appropriate medication." Defs.' Ps & As at 27.   Arellano acknowledges it was legitimate for Guldseth to stop his Gabapentin for failing to show up for a blood draw based on prison regulations.  Specifically, in his own deposition testimony, Arellano testifies "[w]hen I talked to [Guldseth], he told me I missed a blood draw date" and "that's when he took away the Gabapentin because he said I missed basically that dosage, and when he did that, I was like, well, based on regulations, okay." Doc. 49-6, Pl.'s Dep. at 2105; 15:3-7.

Based on this record, the Court finds Arellano's First Amendment retaliation claim rests on mere speculation that Dr. Guldseth reduced and then decided to terminate his Gabapentin prescription because he filed medical grievances.  Without some evidentiary support, Arellano's conclusory allegations are simply insufficient to defeat summary judgment. *See*, *e.g.*, *Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014). Thus, because Arellano must "put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [Guldseth's] intent,'" but has not, Dr. Guldseth is entitled to judgment as a matter of law with respect to Arellano's First Amendment claim. *Brodheim*, 584, F.3d at 1271 (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)).

Arellano also fails to rebut evidence proffered by Dr. Guldseth which demonstrates his decision to taper and then discontinue Arellano's Gabapentin dosage "reasonably advanced [the] legitimate correctional goal" of curbing prescription medication abuse, dependency, and potential diversion within the prison. *See Brodheim*, 584 F.3d at 1269; Doc. 49-3 at ¶ 10, 13; Doc. 49-6 at 1182, 1189; *see also Hicks v. Dotson*, 73 F. Supp. 3d 1296, 1305 (E.D. Wash. 2014) ("The DOC has a legitimate penological goal in regulating prescription pain medication to avoid drug abuse."); *O'Brien*, 2021 WL 960693, at *9–10 (rejecting prisoner's claims that doctor's failure to immediately cite safety and security as a justification to taper his Gabapentin in response to CCHCS's non-opioid pain management policy meant that the discontinuation of the Gabapentin had "no penological interest.").  In fact, while Arellano denies showing any signs of "abuse or addiction to drugs," *see* Doc. 66 at 6, he admitted under oath that the blood draws were ordered because "prisoners sell their meds" and Gabapentin "does give you a mood change and they get you kind of high."  Doc. 49-6 at 2048.

Based on this record, and drawing all facts and inferences in Arellano's favor, the Court finds no jury could find Dr. Guldseth's course of care and treatment decisions did not reasonably advance a legitimate correctional goal. *See Brodheim*, 584 F.3d at 1269; *Miller*, 2018 WL 53406, at *17–18 (granting summary judgment with respect to medical retaliation claim because, even if pain medication was tapered after allegedly protected conduct, the prisoner nevertheless failed to "provide any competent evidence to dispute Defendants' evidence that the reduction and eventual elimination of the morphine reasonably advanced legitimate medical goals.").

For these reasons, the Court also finds Defendant Guldseth is entitled to summary judgment with respect to Arellano's First Amendment retaliation claims.

### 3.    State Law Claims

Guldseth also seeks dismissal of Arellano's remaining state law claim brought under California Civil Code, § 52.1, also known as the Bane Act.  To the extent Arellano is seeking to bring claims under California state law, the Court declines to exercise

supplemental jurisdiction over this pendent state claim because there are no remaining federal claims in this action.   *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction."); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("if the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) ("[O]nce judicial power exists under § 1367(a), retention of supplemental jurisdiction over state law claims under 1367(c) is discretionary.").

### 4.    Qualified Immunity

Finally, both Defendants claim that because Arellano "do[es] not have a clearly established right to a specific course of treatment," they are entitled to qualified immunity with respect to Arellano's Eighth Amendment claims. *See* Doc. 49 at 31-33.

On summary judgment, courts generally resolve questions of qualified immunity through a two-pronged inquiry. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first prong "asks whether the facts, '[t]aken in light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right[.]'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong "asks whether the right in question was 'clearly established' at the time of the violation." *Tolan*, 572 U.S. at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see also Sharp v. Cnty. of Orange*, 871 F.3d 901, 909 (9th Cir. 2016). The court is not required to address the prongs in any particular order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[T]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

However, where, as is the case here with respect to Arellano's Eighth Amendment claims, "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."

*Saucier*, 533 U.S. at 201; *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the Arellano has alleged the deprivation of a constitutional right at all."). Because the Court has found no genuine dispute with regard to Arellano's Eighth Amendment deliberate indifference to serious medical needs against Dr. Guldseth or Dr. Roberts, it need not also decide whether they would be entitled to qualified immunity.

### 5. *Appeal*

A review of the record in this matter shows that the overwhelming evidence undisputedly demonstrates that Arellano was provided adequate medical care by the named Defendants, and thus, the Court **CERTIFIES** that an IFP appeal from this Order would be frivolous and therefore, would not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3).

### III.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Doc. 49) and **DIRECTS** the Clerk of the Court to enter a final judgment in favor of Defendants on all claims and to close the file.

**IT IS SO ORDERED.**

DATE:  May 5, 2023

_____
HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE